

EXHIBIT ONE

# UNITED STATES DISTRICT COURT

for the

District of Maine

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Entire property located at 201 Main Road, Milford,<br>Maine, the person of Agasha Carvalho, and automobiles,<br>as more fully described in Attachment A | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No.   1:25-mj-00310-JCN |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____ Maine _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2252A(a)(2) | Receipt/Distribution of Child Pornography |
| 18 U.S.C. § 2252A(a)(5)(b) | Possession of Child Pornography |
| 18 U.S.C. § 2251 and § 1591 | Production of Child Pornography and Sex Trafficking of Children |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Jose Rodriguez-Aguilar, Special Agent, FBI
*Printed name and title*

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedure

Date:   Sep 17 2025

_____
Judge's signature

City and state:   Bangor, ME     John C Nivison U.S. Magistrate Judge
*Printed name and title*

## UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>- **201 Main Road, Building 7, Apt B, Milford, Maine 04461**<br>- **The person of AGASHA CARVALHO**<br>- **2006 Toyota Avalon with Maine Registration: 690BLQ**<br>- **2012 Chevrolet Suburban with Maine Registration: OVERW8** | Case No.: |

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A SEARCH WARRANT

I, Jose G. Rodriguez-Aguilar, being first duly sworn, hereby depose and state as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since June 2022. I am currently assigned to the Boston Division, Bangor Resident Agency, of the FBI. As part of my duties, I investigate crimes involving the sexual exploitation of minors, interstate threats, interstate stalking, interstate domestic violence, Hobbs Act robberies, wire fraud, and many other criminal violations. I

received training on the proper investigative techniques for these violations, including the use of surveillance techniques, undercover activities, and the application and execution of arrest and search warrants.

2.    I make this affidavit in support of an application for a search warrant for the entire residence of AGASHA CARVALHO (hereinafter "Agasha") located at 201 Main Road, Building 7, Apt B, Milford, Maine 04461 (hereinafter the "SUBJECT PREMISES"), the physical person of Agasha, and the registered vehicles of Agasha which are known to be a green in color 2006 Toyota Avalon with Maine registration "690BLQ", a white in color 2012 Chevrolet Suburban with Maine registration "OVERW8", as well as any computers or data storage devices found therein (hereinafter "DEVICES"), and under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property described with particularity in Attachment A, for contraband and evidence, fruits, and instrumentalities of violations of Title 18, U.S.C § 1591 (Sex Trafficking of Children or by force, fraud, or coercion), 2251 (Production of Child Pornography), 2252A(a)(5)(B) (Possession of Child Pornography) and 2252(a)(2) (Receipt or Distribution of Child Pornography) (hereinafter collectively "Subject Offenses"), which items are more specifically described in Attachment B of this Affidavit.

3.    The information contained in this affidavit is based on my personal knowledge, as well as information relayed to me by other law enforcement agents and officers involved in this investigation, to include Penobscot County Sheriff's Office (PCSO), Bangor Police Department (BPD), Homeland Security Investigations (HSI), and others (hereinafter collectively "Investigators"). This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested search warrant.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that Subject Offenses have been committed by the user of the Apple Inc. iCloud associated with AGASHA CARVALHO with Apple ID accounts: 17443190706, 634954081, 8293895322, 191233775, and 10880319279 (hereinafter collectively "SUBJECT ACCOUNTS") and that such evidence will be located on the DEVICES located within locations described further in Attachment A. There is also probable cause to search the places described in Attachment A for evidence, contraband, and/or fruits of these crimes further described in Attachment B. Upon seizure of any DEVICES found within Attachment A, government-authorized persons will review that information to locate the evidence described in Section II of Attachment B.

## BACKGROUND CONCERNING APPLE[1]

5.      Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

6.      Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). As described in further detail below, the services include email, instant messaging, and file storage: Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

---

[1] The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at https://www.apple.com/legal/privacy/law-enforcement-guidelines-us.pdf; "Manage and use your Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "Introduction to iCloud," available at https://support.apple.com/kb/PH26502; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; and "Apple Platform Security," available at https://help.apple.com/pdf/security/en_US/apple-platform-security-guide.pdf

7.  iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

8.  iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices.

9.  iCloud Backup allows users to create a backup of their device data. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

10.  Find My allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of iOS devices, as well as share

their location with other iOS users. It also allows owners of Apple devices to manage, interact with, and locate AirTags, which are tracking devices sold by Apple.

11.     Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

12.     App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

13.     Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. The account identifier for an Apple ID is an email address, provided by the user. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address. Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

14.     Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information

including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website. In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

15. Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "capability query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the "Find My" service, including connection logs and requests to remotely find, lock, or erase a device, are also maintained by Apple.

16. Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access

Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

17. Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Some of this data is stored on Apple's servers in an encrypted form but may nonetheless be decrypted by Apple. Records and data associated with third-party apps, including the instant messaging service WhatsApp, may also be stored on iCloud.

18. In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who,

what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

19. For example, the stored communications and media connected to the Apple ID may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

20. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

21. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g.,

information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

22.     Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

23.     Therefore, Apple's servers are likely to contain stored images, electronic communications, and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## **PROBABLE CAUSE**

24.     I am currently investigating Agasha Carvalho (hereinafter "Agasha") for possession of child pornography, production of child pornography, receipt and distribution of child pornography, and the sex trafficking of children. The information gathered in this affidavit is intended to demonstrate that Agasha Carvalho engaged in the above listed crimes while living with a 16-year-old female (hereinafter Minor Victim 1- "MV-1") in Hermon, Maine. Furthermore, this affidavit will also show Agasha Carvalho engaged a 13-year-old female (hereinafter Minor Victim-2 "MV-2") for pictures of her vagina, breasts, and videos of her having sex with her boyfriend. Additionally, Agasha offered MV-2 money in exchange for sex with other men.

<u>**CAC Interview of MV-1**</u>

25.     On January 23, 2025, local law enforcement (hereinafter "LLE") attended a Child Advocacy Center interview (CAC) of MV-1. During the CAC interview, MV-1 disclosed that she lived with Agasha in Hermon from October 1, 2024, to December 31, 2024. The following statements were made by MV-1 during the CAC interview:[2]

    a.  MV-1 lived at an apartment in Old Town before moving into Agasha's residence in Hermon. While living in Old Town, mutual friends introduced MV-1 to Agasha. After being introduced, Agasha offered MV-1 a job at Maine Geeks and a place to live.[3] MV-1 moved into Agasha's apartment in Hermon at the beginning of October 2024.

    b.  MV-1 disclosed an incident in which Agasha confronted her in the living room of an apartment. MV-1 was seated on the couch during the interaction. Agasha retrieved a handgun from a small safe and inserted a magazine. After doing so, Agasha sat next to MV-1 and pointed the gun at MV-1's shoulder area. According to MV-1, Agasha was upset over dishes not being done and the apartment not being clean. MV-1 stated this incident made her feel scared for her life. This incident happened in November 2024.

    c.  MV-1 disclosed a second incident involving the firearm. MV-1 and Agasha were in his bedroom, and Agasha retrieved the small black handgun, asking MV-1, "Do you trust me?" During this incident and the first, MV-1 stated she was scared and thought she might die. When

---

[2] Typically, CACs consist of a multidisciplinary team (MDT) created to address child sexual abuse, to include comprehensive forensic interviews of victims of sexual abuse.

[3] Agasha owns and operates Maine Geeks. According to its website, Maine Geeks is an iPhone and computer repair shop. He has locations in Bangor, Ellsworth, and Lincoln.

asked for the date this incident happened, MV-1 stated it happened while she was staying with Agasha from October 2024 to the end of December 2024.

d. Towards the end of December 2024, Agasha confronted MV-1 about trust, stating "I can't trust you, give me the fucking password." While saying this Agasha grabbed MV-1's cell phone and smashed it off the corner of the kitchen island. The phone that was destroyed was a black Samsung. MV-1 showed the cell phone, and the screen was clearly damaged from impact.

26. On January 30, 2025, LLE met with MV-1 at an apartment in Old Town to discuss her phone and extract the data. While meeting with MV-1, LLE explained the process of extracting data from her phone, even though it was broken and beyond repair. In addition, LLE told MV-1 that all photos, videos, text messages, and any information relating to criminal cases would be extracted by the forensic analyst, including any possible new criminal conduct discovered. MV-1 stated she understood and was okay with it and wanted the phone extraction to be done. In addition, MV-1 signed a written consent form.

**Cell Phone Extraction of Black Samsung Belonging to MV-1**

27. On February 25, 2025, LLE spoke with Bangor Police Department Forensic Examiner Holly Jack regarding the cell phone extraction. LLE learned the following about the cell phone extraction:

a. There were several sexually explicit videos depicting MV-1 engaging in sexual acts with different men.

b. A text message thread with a person labeled as "Money" (207-xxx-2152) talking about engaging in sex for money. More specifically,

"Money" asks MV-1, "How much for sex lessons?" to which MV-1 replies, "$200 for an hour." After MV-1 details the cost, "Money replies, "If I am satisfied, I can introduce my friends to come here."

c. Additionally, the examiner found a Facebook messenger thread between Agasha Carvalho and MV-1. In this thread MV-1 and Agasha discussed how MV-1 has "got one for him, but she has a curfew and needs to be home by 6, because of school."

d. In a second Facebook messenger thread between Agasha Carvalho and MV-1, Agasha confronted MV-1 stating, "You busy selling my puntang?" MV-1 denied she was, stating she was visiting an old friend.

e. A text thread with a person labeled "Mami" and MV-1.[4] In this text thread there are pictures of MV-1 holding out $50 bills in Agasha's apartment.[5] And texts of "Mami" asking MV-1, "If MV-1 was getting 'one' for him, and what the girls looked like?"

**Interview of MV-1 with DHHS**

28. On February 26, 2025, LLE accompanied a DHHS worker to a trailer in Old Town, Maine. At that time, MV-1 resided with her mother at this address. During the interview with MV-1, LLE learned the following:

a. MV-1 mentioned being in a hotel room with Malcom Thompson over the previous weekend but would not disclose why she was there. (MV-1 later disclosed that she was having sex with Malcolm Thompson for

---

[4] Based on the context of the messages, LLE believes "Mami" is Agasha.
[5] LLE responded to an incident where Agasha was the victim of a robbery. In investigating that crime, LLE went to Agasha's residence. Based on LLE's familiarity with residence from that investigation, LLE determined the picture of MV-1 holding $50 bills was taken at Agasha's residence.

money, and she was introduced to Malcolm Thompson by Agasha Carvalho in November/December 2024).

    b. MV-1 informed LLE that she had witnessed Agasha Carvalho sex traffic women 3-4 times; Agasha told MV-1, "These women are coming over to have sex for money with other men." In addition, Agasha told MV-1 that she was going to have sex with men for money. Agasha would state, "You're going to fuck them for money for me."

29. Based on LLE's review of MV-1's cell phone extraction and its contents, it appears MV-1 engaged in sex for money.

### Interview of Witness 1 and Witness 2

30. On February 28, 2025, LLE arrived at a residence in Old Town to speak with Witness 1 (hereinafter "W1") and Witness 2 (hereinafter "W2"). Before moving in with Agasha in October 2024, MV-1 resided with W1 and W2. MV-1 and W1 were close friends until they disagreed over MV-1 having sex with men for money. During this interview with W1 and W2, LLE learned:

    a. MV-1 lived with them for approximately 8-9 months before leaving in October 2024 to move in with Agasha. Before leaving in October 2024, MV-1 was attempting to get her child back from DHHS and was not having any issues.

    b. When MV-1 left in October of 2024 to live with Agasha, she informed W1 she was having sex for money. In addition, LLE learned MV-1 had approached MV-2, a 13-year-old female who resided in Milford, on Agasha's behalf about having sex for money. W1 stated Agasha and MV-1 targeted MV-2 because she is a naive and simple girl.

c. MV-1 moved back in with W1 and W2 at the end of December 2024, after Agasha smashed MV-1's cell phone and kicked her out of his apartment in Hermon.

d. While living with W1 and W2, it was common for MV-1 to tell them that she was having sex with men for money. MV-1 told them that she had learned it while living with Agasha.

e. Both W1 and W2 voiced concerns that MV-1 is being sex trafficked and has become accustomed to it.

f. Lastly, W1 mentioned that MV-1 attempted to get her to go to Agasha's house in Hermon to "fuck for money."

g. The majority of MV-1 and W1's conversations regarding Agasha, "fucking for money," and other associated conversations took place on Snapchat, Instagram, and Facebook. These conversations took place from October 1, 2024, to February 2025.

31. The weekend of February 22, 2025, MV-1 left the residence stating she was going to have sex with 38-year-old Malcolm Thompson for money. MV-1 referred to him as her "Sugar daddy." Bangor PD later found MV-1 at 300 Odlin Road, Bangor, Room 109. MV-1 was with Malcolm. Bangor PD went to the hotel after receiving a complaint for a welfare check. The original complainants informed the front desk personnel that when they went inside of room 109, they observed an unresponsive female laying in one of the beds. They felt uncomfortable, left the room, and reported the observation to the front desk of the hotel. Bangor PD was able to briefly interview MV-1 and Malcolm at the time but were not able to verify that there was an unresponsive female. Both MV-1 and Malcolm stated that no one else was in the room.

32. The investigation revealed that CCTV footage of 300 Odlin Road captured

MV-1, Malcolm, and an unknown female exiting the hotel upon check out. The female appeared to be under 18 years of age. In a subsequent interview, MV-1 ultimately identified the unknown female and stated the female was approximately 20 years old. MV-1 informed investigators that Malcolm and the female went into the bathroom at one point during their hotel stay and that MV-1 believed they consumed controlled substances due to the female's cognitive status after the fact.

### Interview of MV-2 (13-years-old) and her mother

33. On February 28, 2025, LLE discovered MV-2 was a student in Milford, Maine. Before arriving at the school to speak with MV-2, LLE contacted MV-2's mother and discussed the issues involving her daughter. MV-2's mother agreed to have her daughter interviewed and accompanied LLE to the school in Milford. Below is a summary of the statements made by MV-2 during the interview:

    a. It was common for MV-1 to take videos of herself masturbating while MV-2 laid next to her. MV-1 would then send the videos to men on Snapchat.

    b. Agasha spoke with MV-2 on the phone asking for pictures of her. MV-2 would send pictures of her face via Snapchat. Agasha wanted pictures of her breasts and vagina, and videos of her having sex with her boyfriend.

    c. In addition to the pressure from Agasha, MV-1 would message MV-2 on Snapchat asking for videos of MV-2 masturbating, pictures of MV-2's breasts and vagina, asking MV-2 to come have sex for money, and to stay with MV-1 at Agasha's residence in Hermon.

    d. MV-1 told MV-2 she was having sex with men for money while living at Agasha's house in Hermon.

e. At one point during their friendship, MV-1 got aggressive with MV-2, pinning her down, and inserting her fingers into MV-2's vagina.

f. The communication from Agasha and MV-1 to MV-2 took place through Snapchat, Instagram, and Facebook. Furthermore, these conversations took place From October 2024 to the end of February 2025.

g. According to MV-2, The Snapchat account (Snap Acct #3), belongs to her, and (Snap Acct #2)/ (Snap Acct #1) belong to MV-1. The communication between MV-2 and MV-1 occurred on both of MV-1's accounts. During LLE reviewing Snapchat search warrant data obtained for Snap Acct #1, #2, and #3, LLE observed a chat thread from November 2024, between MV-1 and MV-2 where MV-2 was solicited by MV-1 to "send me. Few pictures of you" and "Yes bring ur birth control".

**PRELIMINARY SEIZURE OF DEVICES IN BANGOR, MAINE**

34. On or about March 20, 2025, LLE received information from W2 that MV-1 communicated with her via Facebook messenger between March 19th and March 20th. In those messages, MV-1 stated she needed help. W2, concerned for MV-1's welfare, reached out to LLE. On March 21, 2025, LLE, the Federal Bureau of Investigation (FBI), and Homeland Security Investigations (HSI) (all law enforcement agencies involved, hereinafter "Investigators"), attempted to locate MV-1 to ensure her safety. Investigators requested various Emergency Disclosure Requests (EDR) from various companies such as Verizon, SnapChat, and Meta for Facebook and Instagram.

35. MV-1 had previously texted LLE using the phone number 207-xxx-2472

(hereinafter "2472"). Investigators requested an EDR from Verizon Wireless for live location data and subscriber information for 2472. Location data placed 2472 within approximately 200 meters of the Bangor Grande Hotel located at 357 Odlin Road, Bangor, Maine 04401. Investigators conducted in-person interviews of the front desk staff at all of the hotels in the nearby area with negative results of sightings of MV-1. Some hotels had overnight staff arrive at work around 3pm. Based on this information, investigators revisited the "Motel 6- Americas Best Value Inn" located at 1100 Hammond Street, Bangor, Maine 04401. This motel is located within the 200-meter radius of the GPS location for 2472.

36.     Based on the EDR subscriber data from Verizon for 2472, the device is subscribed to Maine Geeks located at 849 Stillwater Ave, Bangor, Maine with the contact names listed as Agasha Carvalho and Marena Mushero. Agasha owns and operates Maine Geeks.

37.     EDR data obtained from SnapChat for MV-1's SnapChat Acct #1, placed MV-1 logging into her SnapChat account on March 21, 2025, at 00:13:03 UTC from Latitude: 44.95206 ± 19.83 meters and Longitude: -68.64291 ± 19.83 meters. Open-source research conducted by Investigators revealed that the address where MV-1 used her SnapChat account via mobile device was near an address in Milford, Maine 04461. That address is known to be near where Agasha lives.

38.     Upon contacting the front desk personnel at the Motel 6, the front desk staff pulled up video footage on their security monitors of a female they thought matched MV-1. The front desk staff noted that MV-1 checked into the motel on or about March 21, 2025, with an adult African American male. The front desk staff advised Investigators that the room MV-1 was in was rented to a Tory Kindred. Based on

previous law enforcement interactions and information, LLE is aware that Tory Kindred is known to distribute drugs in the Bangor area. The front desk personnel also informed Investigators that MV-1 and an adult male arrived in a red sedan that was currently parked in the motel parking lot. The front desk staff walked Investigators to the parking lot and physically pointed out a red in color Chrysler 200 with Maine license plate, "xxxYW". The writer contacted the FBI operations center and requested a National Crime Information Center (NCIC) check on the vehicle with "xxxYW". The NCIC check returned that Matthew Lee Agard (hereinafter "Agard"), was the registered owner of the vehicle and resides in Bangor, Maine. Investigators observed motel security footage of MV-1 and the unknown adult male pull into the motel parking lot in the red Nissan sedan with Maine license plate "xxxxZH" and exit the vehicle walking towards the entrance of the motel on or about March 19, 2025.

39. [Image of MV-1- redacted for privacy, walking to a motel room with an unknown adult male.]



40.     Investigators contacted Bangor PD to assist with the recovery of MV-1 from the motel room. While law enforcement was about to enter the motel, they noticed Agard exiting towards his vehicle. Agard was temporarily detained by Bangor PD while Investigators recovered MV-1 from the motel room. Agard advised Investigators that he

was not Tory, but that he knew MV-1 and that MV-1 was staying with her "uncle" at the motel. Investigators were able to safely recover MV-1 from the motel room. Investigators conducted a brief minimal facts interview of MV-1. LLE had previously obtained a consent-to-interview form signed by MV-1's father so that MV-1 could be interviewed by LLE or at the local CAC.

41.     Agard was interviewed by Investigators through a voluntary, non-custodial interview that was overtly recorded.

42.     In sum, MV-1 informed Investigators that "Tory" invited her to the motel because she had nowhere else to stay. MV-1 and Tory have had sexual intercourse in the past multiple times but did not during her stay at the motel. Tory gave MV-1 a gift card to Walmart and left the morning of March 21, 2025. Tory informed MV-1 that she could use the room until the reservation was done on March 22, 2025.

43.     MV-1 knows Agard as her friend and confirmed that MV-1 and Agard have had sexual intercourse in the past. MV-1 knows that Agard is a school guidance counselor at RSU 3. MV-1 confirmed that she engages in sex acts for money. Per MV-1, adult males often travel from out of state to pay MV-1 for sex.

44.     MV-1 confirmed that Agasha asked MV-1 to find girls for him to have sex with and MV-1 asked many of her friends to do so, regardless of if they were over 18 years of age. MV-1 knows that Agasha's new residence is in Milford near the Milford motel. MV-1 was staying at Agasha's new residence the night of March 18, 2025, because she had nowhere else to go. MV-1 described Agasha's residence as having blue/ gray colors on the front of the residence, brown colors on the side of the residence, and at least containing three apartments within the residence but that Agasha lives on the second floor.

45. MV-1 confirmed that Agasha requested MV-1 send him Child Sexual Abuse Material (CSAM). MV-1 sent Agasha CSAM of MV-2. MV-1 also confirmed that Agasha produced CSAM of MV-1 without her consent with his cell phone by filming their sexual acts without her permission. MV-1 confirmed that Agasha often would force himself onto MV-1 sexually without her consent. MV-1 obtained a new phone in December 2024, that Agasha provided her, after her old one was broken. MV-1 still communicates with Agasha via her cell phone and a lot of other men that pay her for sex.

## IDENTIFICATION OF AGASHA'S APPLE ACCOUNTS AND SNAPCHAT ACCOUNT

46. On or about March 26, 2025, a federal search warrant was obtained for the search of MV-1's mobile device. A preliminary search of MV-1's device revealed that MV-1's device was connected via Wi-Fi to "Agasha iPhone 14 pro" on January 11, 2025. MV-1's device also exchanged iMessage's with phone number XXX-XXX-0513. The messages exchanged between MV-1 and phone number ending 0513 consisted of messages showing that MV-1 was living with that person at their residence, as well as messages that show that the other user persuaded MV-1 to stay at their home often and to not go out. Phone number ending in 0513 was saved as a contact in MV-1's device under the name "Afrika". Investigators are aware that Agasha Carvalho commonly uses the nickname "Africa." On or about March 2025, a subpoena was issued to Verizon Wireless for subscriber information for phone number ending 0513. The Verizon Wireless subscriber information for phone number ending 0513 yielded that it was linked to an account owned by Marena Mushero. The contact person listed for the phone number ending in 0513 is "AGASHA CARVALHO." Investigators are aware that Marena Mushero was possibly, at a prior time, a romantic partner of Agasha. The listed address

on the subscriber record is under business name "Maine Geeks LLC" with address 849 Stillwater Ave, Bangor, Maine."

47.     A preliminary review of MV-1's device showed that MV-1 exchanged messages with phone number XXX-XXX-0513 via the WhatsApp application. The contact of that phone number ending in 0513 was saved in MV-1's device as "Afrika." MV-1 communicated with this user approximately through March 2025. The preliminary review of MV-1's device also yielded that MV-1 search for the business "Maine Geeks" via a Google search. The search result was saved on MV-1's device and included a phone number for the business ending in 0513, which was a direct match for Agasha's phone number.

48.     Preliminary review of MV-1's device also showed that MV-1 ordered packages from "Temu" addressed to her true name, shipped to Agasha's known residence in Hermon, Maine in late 2024.

49.     Preliminary review of MV-1's device yielded that MV-1 exchanged messages with a SnapChat user with username "nilerock" during 2025. During recent interviews with MV-1, she confirmed that the user behind the "nilerock" SnapChat account is Agasha Carvalho.

50.     On or about March 2025, a state search warrant was executed on MV-1's SnapChat account. During a preliminary review of MV-1's SnapChat account, Investigators located what appeared to be an image of MV-1 in black low cut tank top with focus on her top portion of breasts and black underwear. This image was sent from MV-1's account to the SnapChat account "nilerock" on or about February 05, 2025. Investigators also located a chat thread on MV-1's SnapChat account between MV-1 and "nilerock". The following is an excerpt of the conversation from January 30, 2025:

MV-1: "Thank you I am and I miss you Papi"

Nilerock: "how much"

MV-1: "I cried last night thinking abt you"

Nilerock: "what made you cry"

MV-1: "That picture"

Nilerock: "delete that"

MV-1: "Why"

Nilerock: "you know why"

MV-1: "No I don't"

Nilerock: "we spoke about this."

Nilerock: "this does not build trust"

MV-1: "Ok"

[End of excerpt.]

51.     On or about March 2025, a subpoena was served to SnapChat Inc. for subscriber information of SnapChat username "nilerock". The subpoena return yielded that the account "nilerock" was created in February 2017, the account had the email address linked of agasha@outlook.com, and phone number associated of XXX-XXX-0513. The phone number is a direct match with the known phone number of Agasha.

52.     On or about July 2025, a subpoena was served to Apple Inc. for subscriber records pertaining to any accounts held by Agasha Carvalho. The subpoena return yielded that phone number ending 0513 was linked to an account owned by Agasha Carvalho. A review of the subpoena return showed that the following email addresses and Apple ID numbers corresponded with Agasha's Apple accounts:

-   nilerock@outlook.com (Apple ID: 17443190706)
-   mainegeeks@outlook.com (Apple ID: 634954081)

- mail@mainegeeks.com (Apple ID: 8293895322)

- agashacar@hotmail.com (Apple ID: 191233775)

- bn_carvalho@yahoo.com (Apple ID: 10880319279)

- agasha@outlook.com (Apple ID: 634954081)

53. Further review of the Apple Inc. subpoena showed that Agasha owned a "iPhone 14 Pro Space Black 256GB" with serial number "VY9L4PR9XG" with a registration date of February 2023, as well as an "iPhone 15 Pro Black 256 GB" with serial number "GG7NQ6HWRN" with a purchase date of August 15, 2024. As of June 2025, Agasha has an "iPhone 16 Pro White 512GB" with serial number "KMXQ7XR3DX" registered to himself.

54. During a 2025 interview with Cooperating Witness-1 (hereinafter CW-1), they advised Investigators that they participated in group text message conversations with Agasha Carvalho and others. Within these group conversations, CW-1 witnessed Agasha share videos of female victims, naked and restrained. CW-1 knows that videos of MV-1 were among the videos that were shared because he recalled viewing the videos. CW-1 believes that Agasha would have retained those videos as he had a lot of them and was known to often record his sexual encounters with women. CW-1 knows that Agasha is the type of person that would like to re-watch those types of videos at his own leisure.

55. During a 2025 interview with Cooperating Witness-2 (hereinafter CW-2), they advised Investigators that it was common for females to go to Agasha's house and that he would often provide them with drugs and alcohol. CW-2 described these women as women who did not have a good support system and easy to manipulate. CW-2 described the women at Agasha's house as always drugged up via drugs that Agasha

would provide such as cocaine, molly, and heroin. CW-2 recalled that Agasha kept a little red toolbox in his living room that contained chains and whips for the women. Additionally, CW-2 recalled that Agasha had an extensive surveillance system, with cameras in virtually every room in the house.

56.     During a 2025 interview with Cooperating Witness-3 (hereinafter CW-3), they advised Investigators that they knew that Agasha was receiving money in exchange for obtaining women from another individual. The women would receive a minimal percentage of the money exchanged. CW-3 knows that Agasha's residence contains cameras inside and outside of the home that are viewable from Agasha's cell phone. CW-3 recalled a time approximately 2 to 3 years ago when they were present inside of Agasha's residence in Hermon, Maine. CW-3 was inside of the home and observed an adult female (hereinafter Adult Victim-1, "AV-1") inside of the home. AV-1 had consumed drugs which was described as usual for women who are brought to Agasha's residence. AV-1 was instructed by Agasha to clean the bedroom and bathroom. Agasha and another male followed AV-1 into the bedroom and proceed to sexually assault AV-1. CW-3 estimates that the sexual encounter lasts approximately 35 to 40 minutes. When AV-1 exited the bedroom, CW-3 observed AV-1 to be "pale, crying, and as if the life was beaten out of her". CW-3 was later told by the other male involved in the sexual assault that him and Agasha had anal sex with AV-1, that there was blood, and that it was bad. CW-3 knows that Agasha uses "African slave shackles" to restrain women instead of regular handcuffs. CW-3 heard that Agasha would film the women that he would sexually assault. CW-3 believes that Agasha would likely retain any videos of the women due to his arrogant characteristics.

57. On or about June 2025, Investigators interviewed an adult female (hereinafter Adult Victim-2, "AV-2"). AV-2 recalled being sexually assaulted by way of vaginal penetration by Agasha at his residence in Hermon, Maine during 2024. AV-2 recalled that over the last year, Agasha has tried to contact her through various text message numbers so much that AV-2 had to change her phone number and Apple account. AV-2 recalled that Agasha stated to her via text message stated something to the effect of "Don't think I won't be able to see our time again." AV-2 took this to mean that Agasha is able to rewatch the sexual assault of AV-2 from a video recording.

## CONFIRMATION OF CAMERAS AT AGASHA'S RESIDENCE

58. On or about June 2024, PCSO was notified by Agasha of an incident that took place at his residence located in Hermon, Maine. Agasha was assaulted by another male while inside of his home and the interaction was captured on security cameras that Agasha had inside of his home. Agasha later provided the Detective of PCSO with two separate screen recorded video footage from his security camera system. During review of one of screen recorded video footage, Investigators observed the inside of what appeared to be Agasha's residence located in Hermon, Maine. The video footage depicted the kitchen and living room area of Agasha's residence. Within the video footage, an additional security camera could be seen mounted in the living room. During the screen recorded footage, Agasha showed camera footage located inside of his bedroom from a camera that was mounted on the wall. The camera captured most of the bedroom with a focus on the bed within the room.

59. During review of the second screen recorded video that Agasha provided PCSO, Investigators observed the security camera angle from the living room of Agasha's residence. The video footage depicted Agasha, other adult males, and adult females

partying inside of the residence during the night of Agasha's assault. During the date and time stamp on the video of: "2024-06-23 02:32:40", Investigators observed one of the adult males engaged in a sexualized dance with another adult female near a stripper pole that Agasha has in his living room. The adult male appeared to be dry humping the adult female while the adult female had on a tank top and only underwear. At that specific time, Agasha walked up to the male and female, pulled out his cell phone and appeared to record the interaction with his cell phone's video camera.



60. [Image of the description provided in paragraph 59.]

61. During time stamp of the screen recorded security video footage of "2024-06-23 02:34:57", Investigators observed an adult female wearing underwear and a tank top dancing near the stripper pole in Agasha's living room. The female is on her knees and hands with her buttocks positioned higher in the air. Agasha is observed on video footage, walking over to the adult female dancing, taking out his cell phone, and video recording with his cell phone, the female dancing, to include holding his phone in a close-up manner to the female's vagina/ buttocks area. Investigators believe that Agasha

recording sexualized acts is consistent with witness reports.



62.     [Image of the description provided in paragraph 61.]

63.     On or about May 2025, Investigators served Wyze Labs Inc. with legal process for all records pertaining to any accounts held by various identifiers of Agasha. Wyze Labs is the host company of commercial security camera systems. Wyze Labs advised pursuant to the request that an account was located with the email address within the subscriber record of "agasha@outlook.com" and that there were 4 cameras linked to the account. During review of the screen recorded security camera footage provided by Agasha, Investigators observed that Agasha's additional cameras thumbnails were observed during the screen recording. Agasha's camera that was located in his bedroom had the name of the camera listed as "Pet".

**LINKING PHONE NUMBER ENDING 0513 TO 201 MAIN ROAD, BUILDING 7, APT B, MILFORD, MAINE (AKA "AGASHA'S RESIDENCE")**

64. Investigators are aware that Agasha moved from his residence in Hermon, Maine to his residence located at 201 Main Road, Building 7, Apt B, Milford, Maine around January or February 2025. MV-1 confirmed that she knows that Agasha moved residences. MV-1 has visited Agasha at his residence in Milford several times and has stayed with him there overnight at times. Investigators interviewed Agasha's landlord at the Milford location. In sum, the landlord advised Investigators that Agasha is known to them as "Angelo" ("Angelo" is a known legal middle name of Agasha). The landlord confirmed that Agasha moved in during early 2025 and that he lives in apartment B, building 7, of the property located at 201 Main Road, Milford, Maine. The landlord confirmed on September 16, 2025, that the current phone number that Agasha communicates with is phone number ending 0513. The last time the landlord communicated with Agasha where Agasha used phone number ending 0513 was September 15, 2025.

65. The landlord and Investigators are aware that Agasha owns and operates a light green in color, 2006 Toyota Avalon with Maine registration: 690BLQ. The vehicle is registered to Agasha and has been observed parked at his Milford residence as of September 15, 2025. Agasha was last known to be operating the vehicle during the night of September 14, 2025. During the night of September 14, 2025, during the arrest of Agasha by PCSO, the Deputy observed Agasha with multiple electronic mobile devices to include one on his person, one inside of his vehicle, and a USB hard drive stored on a necklace on Agasha's person. The PCSO police report for Agasha's arrest listed the phone number ending 0513 as the best current contact phone number for Agasha.

66. As seen in paragraph 53, during July 2025, Investigators obtained legal process from Apple Inc. which showed that Agasha has current Apple devices registered to him (to include multiple Apple iPhones), the purchase of prior Apple devices by Agasha, and his account being specifically linked to phone number ending 0513.

67. While Investigators are aware that the phone number ending 0513 is used as the contact phone number of Agasha's business, Maine Geeks, multiple witnesses have reported that the phone number ending 0513 is Agasha's cell phone number and that it goes to his physical cell phone when used for calls and text messages.

68. During a mobile device review, pursuant to a federal search warrant for CW-1's mobile device, Investigators observed that CW-1 had a contact saved in their device with the contact's name of "Africa" and phone number ending 0513. Additionally, CW-1 had phone number ending 0513 listed as a WhatsApp contact with the contact's name of "Agasha New". Investigators are aware through training and experience that WhatsApp is used primarily through mobile cell phones.

69. Investigators have conducted surveillance during July 2025 and observed Agasha living at 201 Main Road, Building 7, Apt B, Milford, Maine, which consisted of Agasha remaining at the residence during late hours of the night and early morning of days, commuting to and from the residence in Milford to his businesses, and walking in and out of the residence without anyone else providing him access.

70. Investigators currently have a pole camera installed on the property of 201 Main Road, Milford, Maine with consent from the landlord. The pole camera captures the external staircase that Agasha uses to access his second residence at that location as well as the general parking lot area adjacent to the residential building. Investigators observed that on September 15, 2025, at approximately 8:56 AM, Agasha entered the

passenger seat of his 2012 white in color Chevrolet Suburban with belongings and departed the location with an unknown male driving the vehicle. Investigators observed that on September 15, 2025, at



approximately 12:42 PM, Agasha arrived at his residence in Milford driving his light green in color 2006 Toyota Avalon.



71. [Images of Agasha using his White Chevrolet Suburban and Green Toyota Avalon on September 15, 2025.]

72. I am aware through my training and experience that individuals are able to access Apple iCloud data through various electronic devices which includes but not limited to Apple Inc. products, such as iPhones, iPads, Apple computers, and iWatches. Individuals are also able to access Apple iCloud data through other non-Apple electronic devices, such as Android cell phones, non-Apple computers, non-Apple tablets, etc. by generally logging onto their iCloud account through the iCloud website or by downloading a mobile application that allows you to access your iCloud data. I am aware

that users of Apple products can log onto their Apple iCloud account through virtually any electronic web enabled device and thereafter access their iCloud data through that device. Additionally, those users are then able to download their Apple iCloud data and store the data on virtually any hard drive or external storage media.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO POSSESS AND/OR ACCESS WITH INTENT TO VIEW CHILD PORNOGRAPHY

73.     Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who possess, and/or access with intent to view child pornography:

74.     Individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials. The known desire of such individuals to retain child pornography together with the sense of security afforded by using computers, provides probable cause to believe that computer images, especially child pornography and erotic nudity involving minors, will be retained by the collector indefinitely. These individuals may protect their illicit materials by passwords, encryption, and other security measures. These individuals may also protect their illicit materials by saving it on movable media such as memory cards, memory sticks, CDs, DVDs, flash memory, thumb drives, and removable hard drives, which can be very small in size, including as small as a postage stamp, and easily secreted, or sent to third party image storage sites via the Internet and cloud storage.

75. Persons who access and view child pornography generally also collect other sexually explicit materials related to their interest in children, which may consist of photographs, motion pictures, videos, text material, computer graphics and digital or other images of children that depict child pornography. Such persons may also have images of children or text writing that do not rise to the level of child pornography but fuel their deviant sexual fantasies involving minors. Such persons have been known to take and maintain photographs and video recordings of fully clothed children, not just in sexually provocative poses, but in public places and elsewhere. I am aware that this sort of material has been admitted in trials under Federal Rules of Evidence 404(b) to prove such things as the possessor's knowledge, intent, motive, and identity.

76. Individuals who maintain images of children as described above and child pornography often maintain these images on cameras, film, video cameras, videos, computers, and other photographic equipment. Such individuals have been known to connect their cameras, video cameras, and other photographic equipment to their computers in an effort to create added storage space for their images of children.

77. Individuals who collect child pornography often seek out like-minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica. They do this to gain status, trust, acceptance, support and to increase their collection of illicit images and child erotica. The different Internet based vehicles used by such individuals to communicate with each other include, but are not limited to chat programs, file sharing programs, e-mail, e-mail groups, bulletin boards, Internet Relay Chat ("IRC"), newsgroups, internet clubs, and various forms of Instant Messaging such as Yahoo! Messaging, and "chat" that is sometimes saved on the users' computer or other digital storage media.

78.     Besides photos of minors and child erotica, such individuals often produce and/or collect other written material on the subject of sexual activities with minors, which range from fantasy stories to medical, sociological, and psychological writings, which they save to understand and justify their illicit behavior and desires.

79.     Individuals who collect child pornography often collect, read, copy or maintain names, addresses, including e-mail addresses, phone numbers, and lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests, or have child pornography and child erotica for sale or trade. These contacts are maintained for personal referral, exchange or, sometimes, commercial profit. They may maintain these names on computer storage devices, web sites or other internet addresses, and their discovery can serve as leads to assist law enforcement in proving the instant case and in apprehending others involved in the underground trafficking of child pornography.

## BACKGROUND ON CHILD PORNOGRAPHY COMPUTERS THE INTERNET AND EMAIL

80.     I have had training and experience in the investigation of computer-related crimes, including those involving child pornography. Based on my training and experience, I know the following:

81.     Child pornographers can transfer printed photographs into a computer readable format with a scanner. Furthermore, with the advent of digital cameras and smartphones with cameras, when the photograph is taken it is saved as a digital file that can be directly transferred to a computer by simply connecting the camera or smartphone to the computer. In the last ten years, the resolution of pictures taken by digital cameras and smartphones has increased dramatically, meaning that such

pictures have become sharper and crisper. Photos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or smartphone. These memory cards often store up to 2 Terabytes (TB) of data, which provides enough space to store thousands of high-resolution photographs. Video camcorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive in the camera. The video files can be easily transferred from the camcorder to a computer.

82.     A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography. Child pornography can be transferred via electronic mail or through file transfer protocols (FTPs) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "instant messaging"), and easy access to the Internet, the computer is a preferred method of distribution and receipt of child pornographic materials.

83.     The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution. In addition, there are numerous options available for the storage of computer or digital files. One-terabyte external and internal hard drives are not

uncommon. Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that can be plugged into a port on the computer. It is extremely easy for an individual to take a photo or a video with a digital camera or camera-bearing smartphone, upload that photo or video to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them). Some media storage devices can easily be concealed and carried on an individual's person. Smart-phones and/or mobile phones are also often carried on an individual's person.

84.    The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

85.    Individuals also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer or external media in most cases.

86.    As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files), Digital information can also be retained unintentionally such as the traces of the path of an electronic communication may be automatically stored in many places (e.g.,

temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEM

87. As described above and in Attachment B, this application seeks permission to search for records that might be found on the SUBJECT PREMISES, in whatever form they are found. One form in which the records are likely to be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

88. Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers. Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, accessing the internet, and storing a range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device.

89. I am aware of a report from the United States Census Bureau that shows that in 2016, among all households nationally, 89 percent had a computer, which includes smartphones, and 81 percent had a broadband Internet subscription. Specifically, in 2016, when the use of smartphone ownership was measured separately for the first time,

76 percent of households had a smartphone and 58 percent of households had a tablet, and 77 percent of households had a desktop or laptop computer. Further, according to the Pew Research Center, as of 2019, 96 percent of adult Americans own a cellphone, and 81 percent own a cellphone with significant computing capability (a "smartphone"). The percentage of adults that own a smartphone is even higher among younger demographic groups: 96 percent of 18-29-year olds, 92 percent of 30-49-year olds, and 79 percent of 50-64-year olds owned smartphones in 2019.

90. I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe those records referenced above will be stored on that computer or storage medium, for at least the following reasons: Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.

91. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

92. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a

computer has been used, what it has been used for, and who has used it. This forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

93. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." An internet browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

94. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the SUBJECT PREMISES because:

95. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record

additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

96.	Information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating, or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, computers typically contain information that logs: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the Internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access,

use, and events relating to the crime under investigation.

97. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

98. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

99. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer

is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

100.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

101.    I know that when an individual uses a computer to obtain or access child pornography, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

102.    Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware,

computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of:

103.    The volume of evidence- storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis onsite. Technical requirements- analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches. Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

104.    Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing

elsewhere.

105. The premises may contain computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene. Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge. In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant. If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

106. The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B. If, however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize and search that device pursuant to the probable cause established herein.

107. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

108. This warrant authorizes a review of electronic storage media seized,

electronically stored information, communications, other records and information seized, copied or disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, FBI may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## UNLOCKING A DEVICE USING BIOMETRIC FEATURES

109. I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones and laptops made by Apple, Samsung, and other manufacturers—including the device associated with the subject, Agasha A. Carvalho, in this case—offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

110. The passcodes that would unlock any mobile devices found during the search of the SUBJECT PREMISES are not currently known to law enforcement. Thus, it may be useful to press Carvalho's finger(s) to any such device's fingerprint sensor or to hold the device up to his face, if any such device is enabled with facial recognition capabilities, in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by

this warrant. Moreover, effective use of these biometrics would be additional evidence of Carvalho's ownership and control of any subject device.

111.    For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of Agasha A. Carvalho to the sensor of any devices whose search is authorized by the requested warrant or place the devices in front of his face for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant.

## **CONCLUSION**

112.    Based on the information provided by the investigation, witnesses, and victims to date, Agasha has been repeatedly seen with cellphones and other electronic devices, including as recently as his arrest on September 14, 2025, where he was found in possession of two cellular phones, one on his person and one in his Toyota Avalon. In addition to his cellular phones, he had a USB drive stored as a necklace on his person. Multiple witnesses, including MV-1, have reported that Agasha frequently films his sexual encounters with women. Further, CW-1 participated in group text message conversations with Agasha Carvalho and others. Within these group text conversations, CW-1 witnessed Agasha share videos he had taken using a cellular phone. These videos showed female victims naked and restrained. Some of these videos included recordings of violent sexual encounters between Agasha and women. CW-1 knows that videos of MV-1, including MV-1 being restrained, were among the videos that were shared because Agasha distributed the video by showing them to CW-1. CW-1 believes that Agasha retained those videos because Agasha enjoys re-watching the videos. In my experience and training, the retention of such videos is consistent with individuals who commit crimes against children and violate federal child pornography laws.

113. Based upon the information provided above, I respectfully submit that probable cause exists to believe that there have been violations of Title 18, U.S.C § 1591 (Sex Trafficking of Children or by force, fraud, or coercion), 2251 (Production of Child Pornography), 2252A(a)(5)(B) (Possession of Child Pornography) and 2252 (Receipt or Distribution of Child Pornography) (hereinafter collectively "Subject Offenses"), and that evidence of said violations exists at the SUBJECT PREMISES located at 201 Main Road, Building 7, Apt B, Milford, Maine 04461, the registered vehicles of Agasha (2006 Green Toyota Avalon with Maine registration "690BLQ" and 2012 White Chevrolet Suburban with Maine registration "OVERW8"), and the physical person of Agasha A. Carvalho, as more fully described in Attachment A of this affidavit, and in computers or electronic media therein (DEVICES). As described above, the types of computing and storage devices capable of sending, receiving, and storing information relevant to the above-described crimes can be small, mobile, and easily hidden. They may therefore be found anywhere in the SUBJECT PREMISES or locations described in Attachment A.

114. Therefore, I respectfully request that the attached warrant be issued authorizing the search of the SUBJECT PREMISES, registered vehicles of, person of Agasha A. Carvalho, and any computers or other electronic media therein as fully described in Attachment A, for items described in Attachment B of this affidavit.

115. I am aware that the recovery of data by a computer forensic analyst takes significant time. For this reason, the "return" inventory will contain a list of only the tangible items recovered. Unless otherwise ordered by the Court, the return will not include evidence later examined by a forensic analyst.

_____
JOSÉ G. RODRIGUEZ AGUILAR,
Special Agent, Federal Bureau of Investigation

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedure

Date: Sep 17 2025

City and state: Bangor, ME

_____
Judge's signature

John C Nivison U.S. Magistrate Judge
Printed name and title

## DESCRIPTION OF LOCATIONS TO BE SEARCHED

1. The entire residence located at 201 Main Road, Building 7, Apt B, Milford, Maine 04461, including the residential unit occupied by Agasha A. Carvalho and any residential storage space located on the property that Agasha A. Carvalho specifically uses (the SUBJECT PREMISES). (Images enclosed below)

2. The physical person of Agasha A. Carvalho, Date of birth: June 16, 1980



3. The registered vehicles of Agasha Carvalho:

- 2006 Green in color Toyota Avalon with Maine registration: "690BLQ" (Image enclosed below)

- 2012 White in color Chevrolet Suburban with Maine registration: "OVERW8" (Image enclosed below)

## 201 Main Road, Building 7, Apt B, Milford, Maine 04461





# Registered Vehicles of Agasha A. Carvalho





# ATTACHMENT B
## ITEMS TO BE SEIZED AND SEARCHED

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use, or which is or has been used as the means of committing a criminal offense, namely violations of Title 18, U.S.C § 1591 (Sex Trafficking of Children or by force, fraud, or coercion), 2251 (Production of Child Pornography), 2252A(a)(5)(B) (Possession of Child Pornography) and 2252(a)(2) (Receipt or Distribution of Child Pornography) (hereinafter collectively "Subject Offenses"):

1. Computers, cellular phones, storage medium, and Internet capable devices (hereinafter, "DEVICES")

2. For any DEVICES whose seizure is otherwise authorized by this warrant, and any DEVICE that contains or in which is stored records or information that is otherwise called for by this warrant:

    a. evidence of who used, owned, or controlled the DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, cloud storage and correspondence;

    b. evidence of software that would allow others to control the DEVICES, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the lack of such malicious software;

    d. evidence indicating how and when the DEVICES were accessed or used to determine the chronological context of DEVICES access, use, and events relating to the crime(s) under investigation and to the DEVICES user;

    e. evidence indicating the DEVICES user's knowledge and/or intent as it relates to the crime(s) under investigation;

    f. evidence of the attachment to the DEVICES of other storage devices or similar containers for electronic evidence;

    g. evidence of programs (and associated data) that are designed to eliminate data from the DEVICES;

h. evidence of the times the DEVICES were used;

i. passwords, encryption keys, and other access devices that may be necessary to access the DEVICES, including the use of biometrics to gain access to the DEVICES;

j. documentation and manuals that may be necessary to access the DEVICES or to conduct a forensic examination of the DEVICES;

k. records of or information about Internet Protocol addresses used by the DEVICES;

l. records of or information about the DEVICES'S Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. Access to and content of "Cloud" storage where media is stored virtually; and

n. Evidence of GPS location data from the DEVICES.

3. Contextual information necessary to understand the evidence described in this attachment. Routers, modems, and network equipment used to connect DEVICES to the Internet.

4. Child pornography and child erotica.

5. Records, information, and items relating to violations of the statutes described above including:

a. Records, information, and items relating to the occupancy or ownership of the SUBJECT PREMISES, including utility and telephone bills, mail envelopes, or addressed correspondence;

b. Records, information, and items relating to the ownership or use of DEVICES found in the above residence, including sales receipts, bills for Internet access, and handwritten notes;

c. Records and information relating to the identity or location of the persons suspected of violating the statutes described above;

d. Records and information relating to the sexual exploitation of children, including the correspondence and images sent and/ or received;

e. Records and information relating to the sexual exploitation of children, including correspondence and images sent to and from users of SnapChat;

f. Records and information showing access to and/or use of SnapChat;

g. Records and information to include photographs and videos corroborating the sex trafficking or adults or children

6. Biometrics of Agasha A. Carvalho required to open any device subject to this warrant or showing Agasha's control and ownership of such devices.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies). The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware. These devices will be imaged on scene by computer forensics technicians. The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro-SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.

☑ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
District of Maine

|  |  |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>Entire property located at 201 Main Road, Milford,<br>Maine, the person of Agasha Carvalho, and<br>automobiles, as more fully described in Attachment A | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No.   1:25-mj-00310-JCN |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ Maine _____
*(identify the person or describe the property to be searched and give its location)*:

   See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

   See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before _____ October 1, 2025 _____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ John C. Nivison _____ .
                                               *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for \_\_\_\_\_ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    **3:04 pm, Sep 17 2025** _____
                                                       *Judge's signature*

City and state:    Bangor , ME _____      John C Nivison   U.S. Magistrate Judge
                                                             *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>1:25-mj-00310-JCN | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**Print**     **Save As...**     **Reset**

# ATTACHMENT A

## DESCRIPTION OF LOCATIONS TO BE SEARCHED

1. The entire residence located at 201 Main Road, Building 7, Apt B, Milford, Maine

04461, including the residential unit occupied by Agasha A. Carvalho and any

residential storage space located on the property that Agasha A. Carvalho specifically

uses (the SUBJECT PREMISES). (Images enclosed below)

2. The physical person of Agasha A. Carvalho, Date of birth: June 16, 1980



3. The registered vehicles of Agasha Carvalho:

- 2006 Green in color Toyota Avalon with Maine registration: "690BLQ" (Image

enclosed below)

- 2012 White in color Chevrolet Suburban with Maine registration: "OVERW8" (Image

enclosed below)

# 201 Main Road, Building 7, Apt B, Milford, Maine 04461





# Registered Vehicles of Agasha A. Carvalho





## ATTACHMENT B
## ITEMS TO BE SEIZED AND SEARCHED

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use, or which is or has been used as the means of committing a criminal offense, namely violations of Title 18, U.S.C § 1591 (Sex Trafficking of Children or by force, fraud, or coercion), 2251 (Production of Child Pornography), 2252(4)(B) (Possession of Child Pornography) and 2252 (Receipt or Distribution of Child Pornography) (hereinafter collectively "Subject Offenses"):

1. Computers, cellular phones, storage medium, and Internet capable devices (hereinafter, "DEVICES")

2. For any DEVICES whose seizure is otherwise authorized by this warrant, and any DEVICE that contains or in which is stored records or information that is otherwise called for by this warrant:

    a. evidence of who used, owned, or controlled the DEVICES at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, cloud storage and correspondence;

    b. evidence of software that would allow others to control the DEVICES, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the lack of such malicious software;

    d. evidence indicating how and when the DEVICES were accessed or used to determine the chronological context of DEVICES access, use, and events relating to the crime(s) under investigation and to the DEVICES user;

    e. evidence indicating the DEVICES user's knowledge and/or intent as it relates to the crime(s) under investigation;

    f. evidence of the attachment to the DEVICES of other storage devices or similar containers for electronic evidence;

    g. evidence of programs (and associated data) that are designed to eliminate data from the DEVICES;

h. evidence of the times the DEVICES were used;

i. passwords, encryption keys, and other access devices that may be necessary to access the DEVICES, including the use of biometrics to gain access to the DEVICES;

j. documentation and manuals that may be necessary to access the DEVICES or to conduct a forensic examination of the DEVICES;

k. records of or information about Internet Protocol addresses used by the DEVICES;

l. records of or information about the DEVICES'S Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m. Access to and content of "Cloud" storage where media is stored virtually; and

n. Evidence of GPS location data from the DEVICES.

3. Contextual information necessary to understand the evidence described in this attachment. Routers, modems, and network equipment used to connect DEVICES to the Internet.

4. Child pornography and child erotica.

5. Records, information, and items relating to violations of the statutes described above including:

a. Records, information, and items relating to the occupancy or ownership of the SUBJECT PREMISES, including utility and telephone bills, mail envelopes, or addressed correspondence;

b. Records, information, and items relating to the ownership or use of DEVICES found in the above residence, including sales receipts, bills for Internet access, and handwritten notes;

c. Records and information relating to the identity or location of the persons suspected of violating the statutes described above;

d. Records and information relating to the sexual exploitation of children, including the correspondence and images sent and/ or received;

e. Records and information relating to the sexual exploitation of children, including correspondence and images sent to and from users of SnapChat;

f. Records and information showing access to and/or use of SnapChat;

g. Records and information to include photographs and videos corroborating the sex trafficking or adults or children

6. Biometrics of Agasha A. Carvalho required to open any device subject to this warrant or showing Agasha's control and ownership of such devices.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies). The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high-speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware. These devices will be imaged on scene by computer forensics technicians. The term "storage medium" includes any physical object upon which computer data can be recorded, including external and internal hard drives, flash drives, thumb drives, micro-SD cards, macro SD cards, DVDs, gaming systems, SIM cards, cellular phones capable of storage, floppy disks, compact discs, magnetic tapes, memory cards, memory chips, and other magnetic or optical media.